UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

L.V., a minor, by and through his parent      )
and guardian, LENARD VANDERHOE F,            )
                                             )
                    Plaintiff,               )
                                             )
v.                                           )        No. 3:16-cv-508
                                             )        Judge Phillips
CITY OF MARYVILLE and MAURICE                )
KELLY DIXON, in his individual capacity      )
as an Officer for the Maryville Police       )
Department,                                  )
                                             )
                    Defendants.              )

## **MEMORANDUM OPINION**

On May 19, 2016, plaintiff L.V., a minor, was involved in an automobile accident

in Blount County, Tennessee, with defendant Maurice Kelly Dixon, who is a Reserve

Officer with the City of Maryville Police Department.  Immediately following the accident,

Mr. Dixon detained L.V. and his two passengers at gunpoint for approximately one minute.

L.V. claims that Mr. Dixon and the City of Maryville, Tennessee ("the City") violated his

constitutional rights to due process and to be free from unreasonable seizure and other state

law claims.

Mr. Dixon and the City of Maryville have filed motions for summary judgment

[Docs. 22, 26], with thorough briefs and exhibits in support [Docs. 23, 24, 27, 39, 41] and

the plaintiff has responded in opposition [Docs. 31, 32, 42].  For the reasons set forth

herein, Mr. Dixon's motion will be granted in part and denied in part, and the City's motion will be granted.

## I.    Relevant Facts

Mr. Dixon is employed full-time as an SPO, security police officer, at the Y-12 nuclear plant [Doc. 24-2 at p. 2]. He also works part-time as a reserve police officer with the City of Maryville Police Department [*Id.*]. On the afternoon of May 19, 2016, Mr. Dixon was not on duty with the Maryville Police Department, nor was he wearing a police uniform, traveling in a police vehicle, or carrying a department-issued firearm [*Id.*at pp. 29—30]. Just prior to the accident, Mr. Dixon had mowed his son's lawn and was traveling to his own home in his personal truck towing a lawn mower on a trailer [Doc. 24-2 at pp. 3—5].

At the time of the accident, plaintiff L.V. was 16 years old and driving his first car, a 2000 Ford Mustang [Doc. 26-1 at pp. 2—3]. His friends, brothers N.N. and M.N., also minors at the time, were riding with him [*Id.* at p. 5]. A third friend, D.H., was following L.V. in his own Mustang [*Id.* at p. 7].[1] As the cars approached the intersection of Keener Road and Cunningham Road, L.V. came around a curve too fast and swerved into the oncoming lane of traffic [*Id.* at pp. 9—10]. Mr. Dixon was traveling in the opposite direction [*Id.* at pp. 9—11; Doc. 24-2 at p. 5]. L.V. swerved into the left-hand ditch, hit a

---

[1]The record is unclear whether D.H. was a minor at the time of the accident. However, out of an abundance of caution, the Court will refer to him by his initials. Moreover, although three of the four teenagers are no longer minors, the Court will refer to them by their initials, as they were minors at the time of the accident.

telephone pole, and then swerved back across the road, hitting the front fender of Mr. Dixon's truck in the process [Doc. 26-1 at pp. 9—10].

After the impact and both cars came to a stop, Mr. Dixon exited his truck and approached L.V.'s car about 100 feet away, "[p]robably [at a] fast walk" but he "might have ran" [Doc. 24-2 at p. 8; Doc. 31-3 at p. 5]. As he reached the back of the Mustang, the front passenger, N.N., jumped out and said "Come on, get out, let's go, let's go" [Doc. 24-2 at pp. 10—11].[2] Mr. Dixon observed N.N. reach into the back seat, but he could not see what N.N. was reaching for [*Id.* at p. 11]. Mr. Dixon feared that the passenger was reaching for a gun or other weapon or preparing to flee the scene [*Id.*]. In light of his police training and experience, Mr. Dixon drew his personal handgun and repeatedly directed the three teenagers, "Let me see your hands. Get on the ground." [*Id.* at pp. 11—12].[3] The teenagers complied and got on the ground [Doc. 26-2 at p. 11].

L.V. testified that Mr. Dixon had his gun pointed at L.V.'s head, he told L.V. to put his hands behind his head, and the teenagers were held at gunpoint for about one to two minutes [Doc. 26-1 at pp. 13—14; Doc. 31-5 at p. 4].[4] Ms. Keller estimated the teenagers were on the ground for about five minutes [Doc. 31-2 at p. 7]. Mr. Dixon claims he never had his gun pointed at anyone's head; rather, he had his gun at "low ready" [Doc. 24-2 at

---

[2]L.V. testified that N.N. said, "Get out of the car" "because the car was full of smoke and from the airbag" [Doc. 26-1 at p. 13]. He also stated that M.N. had glass in his arm and N.N. took his shirt off and wrapped it around M.N.'s arm [*Id.*].

[3]Martha Keller, a witness who arrived on the scene immediately after the impact, disputes this testimony and claims that she saw Mr. Dixon get out of his truck with his gun in his hands and run towards L.V.'s Mustang [Doc. 31-2 at pp. 3—4].

[4]L.V. elaborated that, while talking with Ms. Keller, Mr. Dixon had his gun in the "ready" position, meaning his hand was off the trigger and pointed to the ground [Doc. 24-2 at p. 40; Doc. 31-5 at p. 6].

p. 16].  He describes this as aiming at a 45-degree angle, waist-level or lower, and ready to engage if the subject is reaching for something [Doc. 31-3 at pp. 20—21].

Mr. Dixon claims he did not identify himself as a police officer initially, but he did so when talking to Ms. Keller [Doc. 24-2 at p. 14].  Mr. Dixon states that Ms. Keller told him to calm down and that it was just an accident [*Id*. at p. 15].  He believes that he holstered his weapon "about the time" Ms. Keller initially spoke to him [*Id*. at p. 25].  Mr. Dixon admits he "finally told her to shut up and mind her own business and get back in the car" [*Id.* at p. 14].  Ms. Keller refused his instruction to get back in her car [Doc. 31-2 at p. 6].  When Ms. Keller stated she was going to call the police, Mr. Dixon responded, "Fine, call 'em.  I'm a police officer.  I'll talk to them when they get here" [Doc. 24-2 at p. 14].[5] Mr. Dixon explained, "I told her I was a police officer so she would understand that I knew what I was doing and was handling the situation" [Doc. 31-3 at p. 28].  Ms. Keller asked Mr. Dixon if he was with the City or the County, but she did not understand his answer [Doc. 31-2 at p. 22].  While Ms. Keller was on the phone with 911, Mr. Dixon put his gun away and retrieved his police badge from his vehicle [Doc. 24-2 at pp. 18—19, 42].  After her 911 call, Ms. Keller claims that Mr. Dixon told her she could leave because she did not see the accident [Doc. 31-2 at p. 8].  However, she refused to do so because "the situation was not about the accident. It was about his behavior after the accident" [Doc. 31-2 at p. 8].

---

[5]Ms. Keller testified that Mr. Dixon identified himself as "Officer Kelly," rather than "Officer Kelly Dixon" [Doc. 24-2 at p. 51; Doc. 31-2 at p. 4].

Mr. Dixon claims he told the three teenagers they could get up after he put his gun away [Doc. 26-2 at p. 14]. Per Maryville Police Department policy, Mr. Dixon does not have arrest authority when he is not on duty or working in an official capacity [Doc. 24-2 at p. 31].

## II.     Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479—80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.  Analysis

### A.  Acting Under Color of Law

Plaintiff has alleged two violations of his constitutional rights pursuant to 42 U.S.C. § 1983, a violation of his due process rights and a violation of his right to be free from unreasonable seizure.[6]  In order to establish liability under § 1983, a plaintiff must demonstrate: (1) he was deprived of a right secured by the Constitution or law of the United States; and (2) the deprivation was caused by a person acting under the color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Neuens v. City of Columbus*, 303

---

[6]Section 1983 states in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State …, subjects or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law … ."  42 U.S.C. § 1983.

F.3d 667, 670 (6th Cir. 2002). Both defendants argue that plaintiff cannot establish a § 1983 claim because Mr. Dixon was not acting under color of law at the time of the incident. Whether Mr. Dixon was acting under color of law is a legal issue for resolution by the Court. *Neuens*, 303 F.3d at 670.

A state actor's conduct occurs under color of law in the course of performing an actual or apparent duty of his office or if the conduct is such that the actor could not have behaved as he did without the authority of his office. *West v. Atkins*, 487 U.S. 42, 49—50 (1988) (a person "acts under color of state law when he abuses the position given to him by the state"); *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001). "The key determinant is whether the actor *intends* to act in an official capacity or to exercise official responsibilities pursuant to state law." *Waters*, 242 F.3d at 359 (emphasis added) (citing *West*, 487 U.S. at 50). The state actor's conduct must relate "in some meaningful way either to the actor's governmental status or to the performance of his duties." *Id.* "[A] defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Id.*; *see Massey v. Hess*, No. 1:05-CV-249, 2007 WL 2725890, at *5 (E.D. Tenn. Sept. 17, 2007) (Collier, J.) ("the conduct allegedly causing the deprivation of a constitutional right must be "fairly attributable" to the state, either because the actor is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State"). For police officers, "the nature of the act performed … determines whether the officer has acted under color of law." *Neuens*, 303 F.3d at 670 (citing *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir.

1975)). Examples of official police authority include "flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations." *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004); *see Stengel*, 522 F.2d at 441 ("[t]he fact that a police officer is on or off duty, or in or out of uniform is not controlling").

Thus, the question is whether Mr. Dixon's actions after the accident were purely personal or whether he intended to act in an official capacity or exercise official responsibilities. It is undisputed that Mr. Dixon was off duty, in plain clothes, driving his personal vehicle on a personal errand, and carrying his personal handgun. Mr. Dixon identified himself as a police officer only after Ms. Keller stated she was going to call the police. Further, Mr. Dixon did not have his police badge on his person, but he did retrieve it from his truck while Ms. Keller was talking with 911. Mr. Dixon argues that he drew his weapon because he feared that one of the passengers was retrieving a weapon or that the occupants of L.V.'s vehicle were going to flee the scene [Doc. 23 at p. 5]. The City similarly argues that Mr. Dixon acted "functionally equivalent to that of a private citizen" and that the City's policies limit the authority of reserve officers while off duty [Doc. 27 at pp. 10—11].

Plaintiff argues that Mr. Dixon asserted his authority as a police officer by showing his badge, identifying himself as a police officer, and detaining plaintiff and his passengers [Doc. 31 at pp. 4—5; Doc. 32 at p. 4]. Plaintiff relies on Mr. Dixon's answer to the complaint, where Mr. Dixon averred he "was well within his authority to make certain to

secure the scene of the accident" [Doc. 31 at p. 5 (citing Doc. 6 at ¶ 14)]. Mr. Dixon testified that the "authority" referenced in his answer meant his authority "as a police officer" [Doc. 31-3 at p. 41]. Further, plaintiff notes Mr. Dixon's testimony that he identified himself as an officer to Ms. Keller in order to cause her to follow his instructions as a police officer [Doc. 31 at p. 7; Doc. 32 at p. 4]. Mr. Dixon testified that his commands to the three teenagers – "let me see your hands, get on the ground" – are very common general commands used by a police officer [Doc. 31-3 at p. 49].

Mr. Dixon notes his contrary testimony that he did not intend to act on behalf of the City at the time of the incident [Doc. 41 at p. 2 (citing Doc. 24-2 at p. 31)]. He further notes that a civilian has the right to keep someone from fleeing the scene of an accident [Doc. 41-1 at p. 3]. The City similarly responds that Mr. Dixon's actions *after* the incident – identifying himself as a police officer, retrieving his badge – are not relevant to whether Mr. Dixon was acting under color of law at the time of the incident [Doc. 39 at p. 2].

Both sides rely on *Reilly v. Hamblen Cty.*, No. 2:07-CV-283, 2008 WL 4138117 (E.D. Tenn. Sept. 4, 2008) (Greer, J.), in support of their positions. In *Reilly*, the plaintiff was involved in an automobile accident and attempted to use his cell phone to call relatives for assistance. *Id.* at *2. Unable to obtain a signal, the plaintiff walked up to the top of a nearby hill to telephone his father. *Id.* At the bottom of the hill, defendant Devin Cribley, an off duty police officer dressed in casual clothes, was waiting and directed the plaintiff to walk toward him. *Id.* Devin Cribley's brother, David Cribley, appeared and the two brothers grabbed plaintiff, dragged him across a cow pasture, dropped him into a mud

puddle, and started to kick him in the face. *Id*. The plaintiff was then arrested by a Hamblen County deputy sheriff and charged with assault and public intoxication. *Id*.

The *Reilly* court addressed whether Devin Cribley was acting under color of law and recited the legal principles set forth above. *Id*. at *3—4. The court noted that Devin Cribley was off duty and that he was either responding to a call in his role as a volunteer fireman or was acting in his private capacity. *Id*. at 4. Mr. Cribley was not in uniform, he was not driving a police car, and he did not display a badge or a firearm. *Id*. Mr. Cribley did, however, identify himself as an off duty police officer and he did effect an arrest. *Id*. The court concluded that Mr. Cribley was performing duties more akin to those of a police officer by arresting the plaintiff and charging him with violations of state law; therefore, the court could not determine as a matter of law that Mr. Cribley was not acting under color of state law. *Id*.

In comparing the above authorities with the instant case, the Court notes that, unlike the defendant in *Reilly*, Mr. Dixon was involved in the car accident and not "responding" to a scene. He did not arrest or attempt to arrest L.V. or his passengers. Mr. Dixon did hold them at gunpoint and issued orders that are commonly used by a police officer. He did not identify himself as a police officer or display his badge until after he had lowered his weapon. These facts, standing alone, would make for a close question. However, the Court also has the defendant's admission that he "was well within his authority to make certain to secure the scene of the accident" and his testimony that the "authority" referenced in his answer was his authority as a police officer. Defendant testified that he gave the teenagers "loud and precise" verbal commands to "take control of the situation" [Doc. 32-

6 at pp. 22—23].  Defendant also testified that he wanted Ms. Keller to obey his instructions as a police officer [*Id*. at p. 26].  Thus, there is some evidence that defendant intended to exercise his official responsibilities.  *Reilly*, 2008 WL 4138117, at *3.  In light of the defendant's testimony, the Court cannot conclude as a matter of law that Mr. Dixon was not acting under color of law.

### B.    Constitutional Violation

#### 1.    Substantive Due Process

Assuming for purposes of the pending motions that defendant Dixon was acting under color of law, the Court next considers whether plaintiff has created a genuine issue of material fact that he has been deprived of a constitutional right.  The amended complaint asserts violations of both the Fourteenth Amendment and the Fourth Amendment [Doc. 38 at ¶¶ 16—21, 31—40].  The Fourteenth Amendment protects citizens from the arbitrary exercise of governmental power.[7]  *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1988)).  Specifically, plaintiff has alleged that Mr. Dixon deprived him "of his right to liberty by detaining plaintiff at gunpoint without legal justification" [Doc. 38 at ¶ 18].  Plaintiff's reliance on the Due Process Clause of the Fourteenth Amendment is misplaced.

It is well settled that where the United States Constitution provides explicit protection against certain government actions, a plaintiff should pursue his claims under that specific provision rather than under the Substantive Due Process Clause.  *Albright v.*

---

[7]The Fourteenth Amendment bars the States from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

*Oliver,* 510 U.S. 266, 273 (1994) (quoting *Graham v. Conner,* 490 U.S. 386, 395 (1989)). The Supreme Court has unequivocally held that claims by a free citizen of unlawful seizure must be analyzed under the Fourth Amendment. *Graham,* 490 U.S. at 395 ("*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"); *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010) ("which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between"); *Phelps v. Coy,* 286 F.3d 295, 299 (6th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003) ("If the plaintiff was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff, the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard."). Because L.V. was undisputedly a free citizen at the time of his encounter with Mr. Dixon, he was protected by the Fourth Amendment, not the Fourteenth Amendment. Accordingly, plaintiff's substantive due process claim must be dismissed. *Vaughn v. City of Manchester, Tenn.*, No. 4:07-CV-51, 2008 WL 3823738, at *3 (E.D. Tenn. Aug. 13, 2008) (Mattice, J.).

      2.     Excessive Force

The Fourth Amendment guarantees "[t]he right … to be secure … against unreasonable searches and seizures, shall not be violated … ." U.S. Const. amend. IV. A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively

unreasonable. *Graham*, 490 U.S. at 395. A seizure occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Generally, a "seizure" occurs in one of two ways: (1) through the use of physical force by the officer; or (2) through a "show of authority" by the officer, in which the suspect actually submits. *Dillingham v. Millsaps*, 809 F. Supp. 2d 820, 836 (E.D. Tenn. 2011) (citing *Peete v. Metro. Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 220 (6th Cir. 2007), *cert. denied*, 553 U.S. 1032 (2008)). Several circumstances are recognized as indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (quoting *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009). No one disputes that L.V. was seized by Mr. Dixon and the Court can easily so conclude based on the undisputed facts that Mr. Dixon held L.V. at gunpoint and gave orders that are commonly used by police officers.

Mr. Dixon and the City argue that his actions were objectively reasonable based on the information available to him at the time, *i.e.*, his response to a perceived threat [Doc. 27 at p. 14; Doc. 41 at pp. 5—6]. Plaintiff argues that there are material factual disputes as to the reasonableness of Mr. Dixon's actions that preclude summary judgment [Doc. 31 at pp.14—18]. Of particular relevance, plaintiff notes the difference between Mr. Dixon's testimony and that of Ms. Keller as to when Mr. Dixon drew his weapon. Plaintiff argues that if Mr. Dixon drew his gun as soon as he exited his truck, then Mr. Dixon could not

have seen L.V.'s passenger reach into the back seat and his actions were not reasonable. In other words, Mr. Dixon could not be responding to a potential threat if the passenger had not yet reached into the back seat. Plaintiff also notes that Mr. Dixon did not describe the purported actions of the passenger in his written statement to the Blount County Sheriff's Department following the accident [Doc. 31-6].

Thus, the question is whether Mr. Dixon acted with "objective reasonableness," a standard "which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dillingham*, 809 F. Supp. 2d at 841 (quoting *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)); *Graham*, 490 U.S. at 397 ("the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). The objectively reasonable standard requires balancing the cost to the individual against the government's interests in effecting the seizure, and entails "deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Aldini*, 609 F.3d at 865 (citing *Saucier v. Katz*, 533 U.S. 194, 204–05 (2001)). The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry. *Id.* (citing *Graham,* 490 U.S. at 397). Factors for the Court to consider are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

In applying the first factor to the instant case, the Court notes that plaintiff was not charged with a crime, although arguably he could have been charged with reckless driving or other traffic violation. This was not a situation where Mr. Dixon was the victim of a crime or attempted to stop a crime in progress. The parties' interaction was caused solely by a traffic accident. This does not minimize L.V.'s actions, as the consequences could have been much more severe. The Court simply means to distinguish this case from a situation where the plaintiff had committed a crime. Thus, this factor weighs in plaintiff's favor.

As for the second factor, there is no evidence that L.V. posed an immediate threat to the safety of Mr. Dixon or others. There is no testimony that L.V. did anything other than exit the vehicle after the accident. Mr. Dixon, however, observed the front passenger, N.N., reach into the backseat and exclaim, "Come on, get out, let's go, let's go." Mr. Dixon believed, not unreasonably, that N.N. was reaching for a weapon or preparing to flee the scene. Mr. Dixon testified that he did not draw his weapon until he was close to L.V.'s vehicle and observed N.N.'s behavior. Ms. Keller testified, however, that Mr. Dixon already had his weapon drawn before he reached L.V.'s car. Thus, there is a question of fact whether he was responding to N.N.'s actions or not and this factor does not weigh in either party's favor.

The third factor is whether L.V. was actively resisting arrest or attempting to evade arrest by flight. As noted above, there is no evidence that L.V. was resisting in any way or that he was trying to flee the scene. The only evidence is that Mr. Dixon feared that N.N. was going to flee based on his exclamations. Similarly, Ms. Keller's testimony creates a

question of fact as to whether Mr. Dixon drew his weapon prior to N.N.'s actions or in response to them. This factor also does not weigh in either party's favor.

For purposes of summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Matsushita Elec. Indus.*, 475 U.S. at 587). After considering such inferences in favor of the plaintiff, the determination of objective reasonableness is a question of law for the Court. *Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009)). Considering the factors set forth above, the Court cannot conclude that the evidence in this case is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251—52. Whether Mr. Dixon reasonably reacted to N.N.'s actions or whether he predetermined to approach the vehicle with his weapon drawn is a question of credibility for the jury. Accordingly, the Court finds that there is a genuine issue of material fact regarding plaintiff's Fourth Amendment claim.

### 3. Qualified Immunity

The Court notes that Mr. Dixon has raised the defense of qualified immunity, albeit in the most conclusory way, via a footnote [Doc. 23 at p. 8, n.3]. Mr. Dixon has not even attempted to analyze the law of qualified immunity in light of the facts of this case. It is not the Court's duty to make Mr. Dixon's arguments for him, especially when he is represented by able counsel. Accordingly, the Court declines to consider this argument. *McPherson v. Kelsey*, 125 F.3d 989, 995—96 (6th Cir. 1997), *cert. denied*, 523 U.S. 1050 (1998) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones.").

Further, the City of Maryville's attempt to raise this defense on behalf of Mr. Dixon [Doc. 27 at p. 15], also without any factual development, fails. "Qualified immunity is a personal defense that applies only to government officials in their individual capacities." *Benison v. Ross*, 765 F.3d 649, 665 (6th Cir. 2014). The City has presented no legal argument that would allow it to assert a defense on behalf of another party.

## C.    Municipal Liability

The City argues that plaintiff cannot establish a claim of municipal liability on his constitutional claim [Doc. 27 at pp. 15—19]. It is well settled that a municipality may not be held liable under 42 U.S.C. § 1983 "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* Accordingly, to succeed on a municipal liability claim under § 1983, a plaintiff "must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). Put another way, for the City to be liable, plaintiff must prove that a constitutional violation occurred and that the City is responsible for it. *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004).

A plaintiff asserting a § 1983 claim on the basis of a municipal custom or policy must "identify the policy, connect the policy to the [City] itself and show that the particular injury was incurred because of the execution of that policy." *Id.* at 383 (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994)). This means the plaintiff must show "'a direct causal link' between the policy and the alleged constitutional violation such that the [municipal policy] can be deemed the 'moving force' behind the violation." *Id.*

In order to establish municipal liability based on a facially lawful municipal policy, a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998) (citations omitted).

The amended complaint alleges that Mr. Dixon was acting in accordance with the Maryville Police Department policy "to point his firearm at a suspect prior to having justification to use deadly force" [Doc. 38 at ¶ 35]. Plaintiff identifies the following provisions of Maryville Police Department General Order 3-5:

(c)  Officers will never point a firearm at anyone unless they are justified in applying deadly force to that person.

(h)  Officers will not brandish a firearm or otherwise exhibit it in a showy or aggressive manner.  Officers may point a firearm at or in the general direction of a person or animal only when justified in the use of deadly force.

[Doc. 32-4 at p. 1].  Despite the official policy, plaintiff alleges that the City "has a policy of having police officers point a gun at an unarmed suspect who poses no danger" [Doc. 32 at p. 12].  Plaintiff relies on the testimony of Tony J. Crisp, Chief of Police, that an officer can draw his or her gun if deadly force is not authorized "if there's some reason to believe that there could be a threat" [Doc. 32-1 at pp. 8, 20].  Plaintiff also notes Mr. Dixon's testimony that he had his gun in the "low ready position" during the incident even though the suspects were unarmed.[8]  Thus, plaintiff's claim seems to be that the City does *not* follow its written policy and allows officers to draw their gun prior to the use of deadly force.

As the City points out in response [Doc. 39 at p. 4], an officer must logically be able to unholster a firearm prior to the instant in which deadly force is justified.  Plaintiff has presented no evidence that the City was aware of any prior unconstitutional actions of its employees and failed to respond.  *See Stemler*, 126 F.3d at 865.  Plaintiff has presented no evidence that the official City policy or the purported unofficial policy caused plaintiff's alleged injuries.  The only evidence of causation cited by the plaintiff is Ms. Keller's testimony, "Once the children were on the ground, the gun was pointed in their direction"

---

[8]Plaintiff further complains that Chief Crisp did not follow Department policy by conducting an internal investigation of the indent [Doc. 32 at pp. 14—16].  Nevertheless, plaintiff concedes that the City's purported failure to follow the written policy for investigations "are not a direct cause of any constitutional violation alleged in the instant lawsuit" [*Id*. at p. 15].

[Doc. 32 at p. 16].  This testimony falls far short of a "direct causal link" between the City's official or unofficial policy and plaintiff's alleged constitutional violation.  Indeed, L.V.'s testimony highlights the problem with his claim against the City:

> Q:     Explain to me, if you can, what it is that you think the City of Maryville did that caused or contributed to this situation that we're here about today?
>
> A:     They hired Dixon.

[Doc. 24-2 at pp. 43—44].  This is the essence of *respondeat superior* liability and precisely what is not permitted by *Monell*.  436 U.S. at 691 (a municipality is not liable for merely employing a wrongdoer and is not subject to liability on a theory of *respondeat superior*).

Accordingly, the Court finds that the plaintiff has not met the high standard of showing deliberate indifference and the City is entitled to summary judgment as to plaintiff's federal claims.

### D.     State Law Claims

Plaintiff has alleged two state law claims, assault and false imprisonment [Doc. 38 at ¶¶ 22—30].  The City argues that it is entitled to summary judgment on these claims because Mr. Dixon was not acting within the scope of his employment at the time of the accident and also because the City retains immunity from these claims pursuant to the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-205(2) [Doc. 27 at pp. 20—25].  Plaintiff has not responded to these arguments.

The pertinent section of the TGTLA states as follows:

> Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of: … (2) [f]alse

imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights.

Tenn. Code Ann. § 29-20-205(2).

As the City notes, whether an employee was acting within the scope of employment is a question of fact; however, if the facts are undisputed and cannot support conflicting conclusions, it becomes a question of law. *Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992). As noted initially, the facts are undisputed that Mr. Dixon was not on duty at the time of the accident, he was not in uniform, he was driving a personal vehicle, and he was carrying a personal firearm. Thus, there are no facts to support a conclusion that Mr. Dixon was "engaged in the service of his employer or on the employer's business." *Russell v. City of Memphis*, 106 S.W.3d 655, 657 (Tenn. Ct. App. 2002).

Moreover, even if Mr. Dixon was acting within the scope of his employment, this Court has previously noted that claims for false imprisonment and assault are intentional torts that do not sound in negligence. Thus, pursuant to Tenn. Code Ann. § 29-20-205, the City cannot be held liable for negligence based on the alleged commission of intentional torts by an employee. *Branum v. Loudon Cty.*, No. 3:11-CV-351-TAV-CCS, 2014 WL 640634, at *11 (E.D. Tenn. Feb. 19, 2014) (Varlan, C.J.). Further, the TGTLA provides that governmental entities retain their immunity if the purported injury arises out of "civil rights." We have interpreted the plain language in Tenn. Code Ann. § 29-20-205(2) as meaning civil rights claims, including claims arising under 42 U.S.C. § 1983, a type of

intentional tort for which the governmental entity retains immunity. *Id*. at *11—12; *Hodge v. Blount Cty.*, No. 3:16-cv-317, 2017 WL 3841931, at *8 (E.D. Tenn. Sept. 1, 2017) (Reeves, J.); *Foster v. Patrick*, No. 1:12-cv-179, 2014 WL 11515693, at *12 (E.D. Tenn. Oct. 8, 2014) (Mattice, J.), *aff'd*, 806 F.3d 883 (6th Cir. 2015); *Brooks v. Sevier Cty.*, 279 F. Supp. 2d 954, 960 (E.D. Tenn. 2003) (Varlan, J.). Thus, plaintiff's assault and false imprisonment claims clearly arise out of and flow from his civil rights claims. Pursuant to the TGTLA, the City is entitled to immunity for these claims.


IV.    **Conclusion**

For the reasons set forth herein, defendant Maurice Dixon's motion for summary judgment [Doc. 22] will be **GRANTED in part** and **DENIED in part** and defendant City of Maryville's motion for summary judgment [Doc. 26] will be **GRANTED**. An appropriate order will be entered.


    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE