UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

LOGAN VANDERHOEF,                        )
                                          )
              Plaintiff,                   )
                                          )
v.                                        )        No.:   3:16-CV-508-TAV-DCP
                                          )
MAURICE KELLY DIXON,                      )
                                          )
              Defendant.                   )

## MEMORANDUM OPINION AND ORDER

On March 20, 2018, the jury trial in this civil matter began.  On March 22, 2018,

the civil jury returned a verdict, finding defendant liable for a civil rights violation under

42 U.S.C. § 1983 and for assault and false imprisonment under Tennessee state law [Doc.

103].  At trial, defendant moved for directed verdict on the grounds that defendant was

entitled to qualified immunity.  The Court took this under advisement, and now defendant

has moved for judgment as a matter of law on the question of qualified immunity as well

as on the individual claims themselves [Doc. 118].[1]  Plaintiff responded in opposition [Doc.

119] and defendant replied [Doc. 120].  For the following reasons, the Court will grant

defendant's motion.

---

[1] Plaintiff filed a motion for leave to file a supplemental brief [Doc. 121].  Defendant
responded in opposition [Doc. 122], and plaintiff replied [Doc. 123].  After reading the proposed
supplemental brief, the Court finds that it is more properly considered as a sur-reply.  The Court
**GRANTS** plaintiff's motion [Doc. 121] for the limited purpose of replying to the alleged "new
argument" raised by defendant in his reply [Doc. 120].

## I.     Background

Defendant, Maurice Dixon, is employed full-time as an SPO, security police officer, at the Y-12 nuclear plant [Doc. 116 p. 137].  He also works part-time as a reserve police officer with the City of Maryville Police Department [*Id*.].  On the afternoon of May 19, 2016, defendant was not on duty with the Maryville Police Department, nor was he wearing a police uniform, traveling in a police vehicle, or carrying a department-issued firearm [*Id*. pp. 142, 150–52].  As he was driving home from mowing his son's lawn, defendant was involved in a car accident with plaintiff, Logan Vanderhoef.  [*Id*. p. 142].  At the time, he was traveling to his own home in his personal truck towing a lawn mower on a trailer.

At the time of the accident, plaintiff was driving a 2000 Mustang that he had owned for seventeen days [Doc. 117 p. 42].  He had two friends, who were minors at the time, riding with him [*Id.* p. 43], and a third friend was following plaintiff in his own Mustang [*Id.* p. 44].  As the cars approached the intersection of Keener Road and Cunningham Road, plaintiff came around a curve too fast, revving his engine, and swerved into the oncoming lane of traffic [Doc. 116 p. 147].  Defendant was traveling in the opposite direction [*Id*. p. 145].  Plaintiff swerved into the left-hand ditch, hit a telephone pole, and then swerved back across the road, hitting the front fender of defendant's truck in the process [*Id.* pp. 145–46].

After the impact and both cars came to a stop, defendant exited his truck and approached plaintiff's car, which was about 120 feet away [Doc. 115 p. 30].  As

defendant was approaching the vehicle, the front passenger jumped out and said, "Let's go, let's go, come on" [*Id.* p. 56]. Defendant then observed the front passenger reach into the back seat, but he could not see what he was reaching for [Doc. 116 pp. 150–51]. At some point between the car accident and when defendant reached plaintiff's vehicle, he drew his personal handgun and repeatedly directed the three teenagers, "Let me see your hands, get on the ground" [*Id.*]. The teenagers complied and got on the ground [*Id.*]. Defendant claims that he feared that the passenger was reaching for a gun or other weapon or preparing to flee the scene [*Id.*].

Plaintiff testified that defendant had his gun pointed at plaintiff's head, he told plaintiff to put his hands behind his head, and the teenagers were held at gunpoint for about two to three minutes [Doc. 115 pp. 33–34]. Ms. Keller, who appeared at the scene shortly after the accident, estimated the teenagers were on the ground for less than five minutes [*Id.* p. 75]. Defendant claims he never had his gun pointed at anyone's head; rather, he had his gun at "low ready" [Doc. 116 p. 155]. He describes this as aiming at a 45-degree angle, between the suspect's waist and their knees [*Id.* p. 154].

Defendant claims he did not identify himself as a police officer initially, but he did so when talking to Ms. Keller [*Id.* p. 189]. Defendant states that Ms. Keller told him to calm down and that it was just an accident [*Id.* p. 160]. He states that he reholstered his gun while he was speaking with Ms. Keller and that he did not pull his gun out again [*Id.*]. Defendant admits he "told her to shut up, mind her own business, and get back in your car" [*Id.*]. When Ms. Keller stated she was going to call the police, defendant

responded, "Fine, call them. I'm a police officer and I'll talk to them when they get here" [*Id.*]. Ms. Keller asked defendant if he was with the City or the County, but she did not understand his answer [Doc. 115 p. 77]. While Ms. Keller was on the phone with 911, defendant put his gun away and retrieved his police badge from his vehicle [Doc. 116 p. 162].

During the time that defendant and Ms. Keller were speaking, plaintiff and the other occupants of the vehicle remained on the ground [Doc. 115 p. 39]. Plaintiff states that he could only "somewhat" hear the conversation between defendant and Ms. Keller and that he "didn't have a clear recollection of what was being said" [*Id.* pp. 59–60]. After defendant and Ms. Keller finished speaking, defendant gave plaintiff permission to get up and call his mom [*Id.* p. 39].

Plaintiff brought this action [Doc. 1] against the City of Maryville and Mr. Dixon. Defendant moved for summary judgment [Doc. 26], which this Court granted in part and denied in part [Doc. 46]. Trial lasted from March 20, 2018, until March 22, 2018, and the jury considered plaintiff's § 1983, assault, and false imprisonment claims. The jury returned a verdict in favor of plaintiff on all three issues [Doc. 103]. Defendant now moves for judgment as a matter of law on these same issues [Doc. 118].

## II.    Standard of Review

Rule 50 of the Federal Rules of Civil Procedure permits a motion for judgment as a matter of law to be renewed within twenty-eight days of the entry of judgment. Fed. R. Civ. P. 50(b). "In ruling on the renewed motion, the court may: (1) allow judgment on the

verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.* In order to be successful, the movant must show that a "reasonably jury would not have a legally sufficient evidentiary basis" to find for the non-moving party. *Id.* In considering this question, "'[t]he evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury.'" *Schwartz v. Sun Co., Inc. (R&M)*, 276 F.3d 900, 903 (6th Cir. 2002) (quoting *K&T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175-76 (6th Cir. 1996)). Rather, the court "must 'view the evidence in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.'" *Id.* (quoting *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 482 (6th Cir. 1990)).

Government officials are shielded from liability under the doctrine of qualified immunity so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Plaintiff must plead facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). Qualified immunity is an affirmative defense,[2] and once raised, the plaintiff must show that the official violated a right so clearly established that a "reasonable official would have understood that what he [was] doing

---

[2] Defendant pleaded qualified immunity in his answer [Doc. 48].

violate[d] that right." *Id.* at 741 (internal citation and quotation marks omitted). The plaintiff bears the ultimate burden of proof, *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005) (citation omitted), and if the plaintiff fails to carry his burden as to either element of the qualified-immunity analysis, then the official is immune from suit, *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012).

While qualified immunity is ordinarily raised at the summary judgment stage, the defense "remains available to the defending officials at trial; but at that stage, the defense must be evaluated in light of the character and quality of the evidence received in court." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). If the district court does not rule on this defense prior to trial, the court must consider the trial record rather than the pleadings or the summary judgment record. *Id.* If the defendant raises the issue of qualified immunity after trial, as defendant did here, "the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." *Id.*

## III.    Color of Law

The Court will first address the question of whether defendant was acting under the color of law when he drew his gun and briefly detained plaintiff and the other occupants of the car. Defendant argues that, based on the evidence presented at trial, a reasonable juror could only have found that defendant was not acting under color of law [Doc. 118 p. 15]. Defendant cites *Waters v. City of Morristown*, which states that "[t]he key determinant is whether the actor intends to act in an official capacity or to exercise official responsibilities pursuant to state law." 242 F.3d 353, 359 (6th Cir. 2001). Under *Waters*, the individual's

actions must relate to the individual's governmental status. *Id.* Defendant argues that the following facts established at trial show that defendant was not acting under the color of law:

> Defendant was traveling on Keener Road in his personal capacity, he was not wearing a police uniform, he was not driving a police vehicle, he did not display a police badge to Plaintiff, nor did he announce to Plaintiff that he was a police officer, he was carrying his personal firearm, he didn't place anyone under arrest, he was not within the city limits of Maryville where his police department has jurisdiction, and as an off-duty officer he would not have had the authority to effect an arrest as a City of Maryville Officer.

[Doc. 118 p. 16]. Defendant further notes that while he did identify himself as a police officer to Ms. Keller, that conversation was "not particularly audible to [p]laintiff" [*Id.*]. Defendant argues that "identification after the injury does not render the [act] an act committed under color of state law." *Corder v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 89-5699, 1990 WL 33708, at *3 (6th Cir. Mar. 27, 1990).

Plaintiff responds, arguing that defendant "exercised official authority to enforce state law, showed his badge, identified himself as a police officer, and detained individuals including the plaintiff" [Doc. 119 p. 12; (*citing Reilly v. Hamblen County*, No. 2:07-cv-283, 2008 WL 4138117, at *4 (E.D. Tenn. Sept. 4 2008) ("Such manifestations of official authority include flashing a badge, identifying oneself as a police officer, [or] placing an individual under arrest."))]. Plaintiff argues that because defendant held plaintiff at gunpoint, identified himself to Ms. Keller, and ordered Ms. Keller to leave the scene, he was exercising his official authority as a police officer.

An individual acts under color of law when he exercises "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotations omitted). The Court must look to "whether the actor *intend[ed]* to act in an official capacity or to exercise official responsibilities pursuant to state law." *Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) (emphasis added) (citing *West*, 487 U.S. at 50). An individual acting "in the ambit of their personal pursuits" is not acting under color of law. *Screws v. United States*, 325 U.S. 91, 111 (1945). "Accordingly, a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters*, 242 F.3d at 359. Actions like showing a badge, identifying oneself as an officer, or detaining individuals would indicate that the actor is exercising official authority. *See Reilly*, 2008 WL 4138117, at *4. However, "identification after the injury does not render the [act] an act committed under color of state law." *Corder*, 1990 WL 33708, at *3.

Viewing the facts in a light most favorable to plaintiff, the Court cannot conclude as a matter of law that defendant was not acting under color of law. While defendant was driving his personal vehicle in his personal capacity and carrying his personal firearm, he did identify himself as an officer to Ms. Keller after ordering plaintiff on the ground and drawing his weapon. At trial, plaintiff said that he could "somewhat" hear the conversation between Ms. Keller and defendant, and given the fact that plaintiff heard this while on the ground and with defendant's gun pointed in his general direction, it would appear that

defendant was exercising some level of authority [Doc. 115 pp. 59–60]. Furthermore, defendant testified that his response to the situation was, in part, due to his extensive training and the fact that he had responded to "hundreds" of accident scenes [Doc. 116 pp. 137, 139–41, 155–56, 164]. The Court also notes that while identification as an officer after the incident does not necessarily mean that a person was acting under color of law, the trial record indicated that when defendant identified himself as an officer to Ms. Keller, plaintiff was still on the ground and defendant still had his weapon drawn [*Id.* at pp. 160–62]. It therefore appears that the situation had not ended but was rather ongoing when defendant identified himself. Given the trial record, the Court cannot say that defendant was not acting under color of law.

## IV.     Qualified Immunity

### A.     Official Violated a Statutory or Constitutional Right

Defendant first argues that his actions did not violate a constitutional right because they were not objectively unreasonable [Doc. 118 p. 3]. Defendant argues that drawing a weapon is reasonable when the officer perceives a threat to his safety. *See Tallman v. Elizabethtown Police Dept.*, 167 F. App'x 459, 463 (6th Cir. 2006) (holding that it was reasonable to pull a weapon after a vehicle chase when the officer could not see the passenger's arms or hands); *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir. 1990) (holding that it was reasonable for an officer to draw a weapon when approaching an individual in a car not his own at night); *Leber v. Smith*, 773 F.2d 101, 105 (6th Cir. 1985) (holding that it was reasonable for an officer to draw his weapon after engaging in a high-

speed chase at night with a suspect who was possibly suicidal). Defendant argues that at trial, he showed that plaintiff was speeding and driving recklessly when he hit defendant's car [*See, e.g.*, Doc. 115 pp. 30–31, 143–46]; the passengers were trying to get out of the car; the passengers were yelling, "Get out of the car" [*Id.* p. 33]; and that he only drew his weapon after observing all these events [*Id.*]. Defendant asserts that based on these facts, it was not unreasonable for him to fear for his safety and draw his weapon [Doc. 118 p. 7].

Defendant further asserts that the brief investigatory decision was also reasonable [*Id.* p. 8]. Defendant cites *Arbuckle v. City of Chattanooga*, where this Court held that a brief detention was reasonable because the officers were not sure if the plaintiff was armed or if other people were in the home. 696 F. Supp. 2d 907, 925 (E.D. Tenn. 2010). Defendant cites *Adams v. Williams*, where the Supreme Court noted that it was reasonable for an officer to briefly stop a suspicious individual to maintain the *status quo* of a situation. 407 U.S. 143, 145–46 (1972). Defendant also points to the jurisprudence of the Tennessee courts on *Terry* stops [Doc. 118 p. 9 (using this line of cases to highlight the law "as Defendant would have understood it")]. Defendant argues that an officer is able to briefly detain an individual if the officer has reasonable suspicion to believe that a criminal offense has been or is about to be committed. *See State v. Montgomery*, 402 S.W.3d 482, 487 (Tenn. 2015). Defendant argues that because his seizure of plaintiff "was narrow in scope and ended once it was clear that [p]laintiff and his friends were not running from the scene or in possession of weapons," it was a reasonable seizure under both federal and state law [Doc. 118 p. 11].

In response, plaintiff argues that qualified immunity does not protect officers who "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Plaintiff further argues that the jury established that defendant pulled his gun before exiting the vehicle [Doc. 115 pp. 68, 74, 104, 105]. Plaintiff states that "taking the evidence in the light most favorable to the plaintiff, there are no facts that justify [defendant]'s use of force when he began pointing his gun at the plaintiff" [Doc. 119 p. 14]. Plaintiff states that defendant admitted he had no justification for pulling his gun when he exited the vehicle [Doc. 115 pp. 68, 74, 75, 150]. Thus, plaintiff asserts, defendant knowingly violated the law when he drew a weapon that was not justified [Doc. 119 p. 14].

The Court will first examine whether defendant violated plaintiff's constitutional right to be free from excessive force. *al-Kidd*, 563 U.S. at 735. While the Fourth Amendment prohibits unreasonable seizures to protect citizens from the use of excessive force by law enforcement officers, *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015), the government does have a "right to use some degree of physical coercion[,] or threat thereof," when carrying out an arrest. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham*, 490 U.S. at 396).

In evaluating a claim of excessive force, courts should utilize the Fourth Amendment's "objective reasonableness" standard, whereby a court analyzes whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 399. Reasonableness is determined by "balanc[ing] the nature and quality of

the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks and citations omitted).

Three non-exclusive factors should be examined in making this determination: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight ("the *Graham* factors"). *Graham*, 490 U.S. at 396. The Sixth Circuit has stated that this standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Smoak*, 460 F.3d at 783 (citing *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)). These factors are evaluated from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id.* Additionally, these three factors are not an exhaustive list, and a court's ultimate inquiry should be "whether the totality of the circumstances justifies a particular sort of seizure." *Id.* The circumstances should be evaluated at the moment force is employed. *See Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007) (stating that the reasonableness of the use of force at a particular time is based on an "objective assessment of the danger a suspect poses at that moment"). Courts should account for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

In evaluating a defendant officer's qualified immunity defense, "the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

This Court must first decide whether it was objectively reasonable for defendant to draw his weapon given the circumstances in this case. First, turning to the severity of the crime at issue, defendant claims that he believed the vehicle to be stolen [Doc. 116 p. 151]. In *Pleasant*, the officer arrived at night to a scene where a felony was taking place. 895 F.2d at 276. The suspect was sitting in a car that he did not own, and the officer could not see what the suspect had with him in the car. *Id.* The Court held that the officer's display of a weapon was not unreasonable given these circumstances. *Id.* Similarly, in *Leber*, the officer acted objectively reasonably when he approached a vehicle at nighttime after a high-speed chase, knowing that the occupant was suicidal and unpredictable. 773 F.2d at 102. In *Tallman*, again, the Court held that an officer was reasonable in drawing his weapon when, after a high-speed chase, the driver began to flee on foot, and the officer was unable to see the passenger's arms or hands. 167 F. App'x at 460–61.

The facts in this case are most similar to the facts in *Tallman* where the officer, during daylight, approached a car after one occupant appeared to flee and the other occupant remained in the vehicle with his arms and hands out of sight. However, several facts are distinguishable. First, in *Tallman*, the officer approached the car after he had

13

witnessed a traffic violation, engaged in a high-speed chase, and stopped the car by using "stingers" on the roadway. *Id.* Here, while defendant did observe a serious traffic violation when plaintiff drove erratically across the road and slammed into his truck, there was no high-speed chase or immediate attempt by plaintiff to speed off. Second, the officer in *Tallman* actually watched the driver flee on foot, whereas in this case, defendant only had a belief that the occupants *might* flee. Third, when the officer in *Tallman* gave verbal commands, the passenger did not respond or act like he was going to comply with the officer. *Id.* at 461. In this case, plaintiff and his passengers responded to defendant's orders immediately.

The question of when defendant actually drew his weapon was a focal point during trial. While plaintiff simply asserts that the jury found that he drew the weapon before exiting the vehicle, this oversimplifies the issue. The jury found that defendant's show of force was objectively unreasonable,[3] but the parties cannot say definitively that this finding

---

[3] The Court does not need to adopt the jury's finding that the force was unreasonable in the qualified immunity analysis. *See Ortiz*, 562 U.S. at 184 (holding that the Court considers the trial record when evaluating qualified immunity defenses after trial). Juries are finders of fact, and the question of qualified immunity is a legal question that should be resolved as early as possible in litigation. *See Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009). This protects officers from burdensome discovery and litigation that disrupts the effective function of government, *see Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987), and prevents the Court and the parties from wasting time and resources on questions that, as a matter of law, should not be presented to the jury. Therefore, addressing qualified immunity *after* a case has gone to trial is contrary to the very purpose of qualified immunity and should only be done in limited circumstances. Regardless of counsel's failure to address this issue until trial, this Court considers the evidence at trial in a light most favorable to the nonmoving party under the standard set forth in Federal Rule of Civil Procedure 50(b), stating that if the Court declines to rule on a motion for directed verdict under Rule 50(a), "the [C]ourt is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."

means that defendant drew his weapon before exiting the vehicle. However, because the Court construes any ambiguities in a light most favorable to the nonmoving party, the Court must evaluate defendant's perception of the severity of the crime at the time he exited the vehicle. At that time, he only had knowledge of the car accident, and while he might have thought the car had been stolen, there were no other circumstances at that moment (i.e., nighttime, fleeing suspect, high-speed car chase, etc.) that would indicate a serious crime had been committed.

Even if it was reasonable for defendant to believe a serious crime had been committed, the Court must next look at whether the suspect poses an immediate threat to the officer. Defendant claims that he could not see anyone in the backseat but saw the front passenger reaching in the backseat [Doc. 116 p. 151]. In both *Pleasant* and *Tallman*, the Sixth Circuit considered the fact that the officer could not see the suspect's hands in evaluating whether drawing a weapon was appropriate. At trial, again, plaintiff and another witness testified that defendant had already drawn his weapon when he exited his vehicle [Doc. 115 pp. 68, 74, 104, 105]. Viewing the facts in the light most favorable to plaintiff, from "the information available to [defendant] at the time," *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003), it was unreasonable for defendant to believe that plaintiff posed an immediate threat to defendant following the car accident but before defendant exited the vehicle.

Third, and finally, looking at whether the suspect is attempting to evade arrest by flight, defendant claims that he heard people yelling, "[c]ome on, get out, let's go" [Doc.

116 p. 151]. Again, viewing the facts in a light most favorable to plaintiff, defendant already had his weapon drawn before he heard the occupants of the vehicle shouting to get out of the car and allegedly flee the scene [Doc. 115 pp. 68, 74, 104, 105]. Thus, it was also unreasonable for defendant to believe that the vehicle occupants were trying to evade arrest following the car accident but before defendant exited the vehicle.

**B.      Right was "Clearly Established"**

Next, the Court turns to the question of whether defendant violated clearly established Fourth Amendment rights by drawing his weapon on the individuals and briefly detaining them.[4]  Defendant argues that the right was not "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018). Defendant cites several cases where courts have found that an officer's use of force was appropriate when a suspect was attempting to flee. *See, e.g.*, *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013) (holding that it was reasonable for an officer to point a gun at the individuals who appeared to be attempting to flee and who were disobeying officer commands); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 497 (6th Cir. 2012) (holding that it was reasonable for an officer to use non-deadly force when apprehending a fleeing non-felon). Defendant argues that in the case before this Court, defendant witnessed a traffic violation and heard

---

[4] Because the Court found that it was unreasonable for defendant to draw his weapon in the first place, it is unnecessary to decide whether the brief detention was also unreasonable. For the same reasons set forth above, the Court finds that it was.

individuals shouting to "get out," which he interpreted as an attempt to flee, and thus it was reasonable for him to draw his weapon [Doc. 118 p. 14].

Plaintiff responds by reiterating the fact that defendant pulled his weapon before he got out of the car [*see generally* Doc. 119]. Plaintiff argues that because defendant admitted that he was not justified in drawing his weapon until he heard and saw the passengers yelling to "get out", and he drew his weapon before this occurred, he knowingly violated the law. According to plaintiff, this means he cannot be protected under the qualified immunity defense [*Id.* p. 14].

It is worth reiterating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Deciding whether a right was clearly established, then, requires the Court to look at the specifics of the case. *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007). Qualified immunity does not apply if "no reasonably competent officer" would have taken the same action; however, "if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Recently, in *Kisela v. Hughes*, the Supreme Court clarified the "clearly established" prong of the qualified immunity analysis. The Court noted that officers are entitled to qualified immunity unless there is precedent that "squarely governs" the specific facts. *Id.* at 1153. Plaintiff bears the burden of showing that an officer is not entitled to qualified immunity, and "[i]f the plaintiff fails to carry this burden as to either element of the analysis, qualified

immunity applies and the state official is proof against the plaintiff's suit." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012).

In *Dorsey v. Barber*, however, the Sixth Circuit found that while the officer's "response to the apparent demands of the situation seems to have been exaggerated," the officer was not necessarily disqualified from qualified immunity. 517 F.3d 389, 400 (6th Cir. 2008). In *Dorsey*, the officer identified two individuals who matched the description of suspects wanted for auto theft. *Id.* They initially resisted his orders to stop, so he drew his weapon and ordered them to the ground. *Id.* The Court held that "there is no support for the notion that [the officer] knowingly and deliberately violated plaintiffs' right to be free from unreasonable seizure." *Id.* The officer's mistake was not "so egregious as to suggest outright incompetence." *Id.*

The same is true in this case—defendant's actions were not "so egregious" that they were "outright incompetent," nor did he "knowingly and deliberately" violate plaintiff's rights. The Court cannot say that no reasonable officer facing the same circumstances would have believed defendant's actions were justified. Just like the officer in *Dorsey*, defendant here made a mistake—the car was not, in fact, stolen, and the vehicle occupants were not, in fact, fleeing.

No case is squarely on point, and reasonable officers could disagree about defendant's response. In addition, plaintiff does not cite any cases that would show that this is clearly established. In *Cockrell v. City of Cincinnati*, the Sixth Circuit held that it was not clearly established that a "misdemeanant, fleeing from the scene of a non-violent

18

misdemeanor, but offering no other resistance and disobeying no official command," had right not to be tased. 468 F. App'x 491, 495 (6th Cir. 2012). Similarly, here, it is not clearly established that an individual who caused a serious traffic accident by speeding, crossing the center line, hitting another vehicle, and totaling his car has a right not to have an officer display his weapon to secure the scene. In *Arbuckle v. City of Chattanooga*, this Court noted that "[f]ear for personal safety may justify the use of weapons to detain individuals for investigative purposes only." 696 F. Supp. 2d 907, 924 (E.D. Tenn. 2010). An officer is able to maintain the "status quo" of a scene momentarily. *Adams v. Williams*, 407 U.S. 143, 145–46 (1972). Although the Court recognizes that it must separately analyze the detention and the force used to effectuate the detention, it is clear that an officer may use force in certain circumstances. Whether this was one of those circumstances is not clearly established.

Viewing the facts in a light most favorable to plaintiff, defendant displayed his weapon before he heard plaintiff and the other vehicle occupants shouting to "get out" or saw them reaching in the back seat. It is not clear whether, given the recklessness of plaintiff's driving and the dramatic nature of the wreck itself, an officer would be justified in drawing his weapon to secure the scene and maintain the status quo. Reasonable officers could disagree, and plaintiff provides no law that is squarely on point so that defendant would have been on notice that his actions were unreasonable. There are cases that indicate that an officer can secure the scene of a crime by detaining individuals momentarily, *see, e.g.*, *Adams*, 407 U.S. at 145–46, and there are cases that suggest an officer can use force

to effectuate the detention in certain circumstances, *see e.g.*, *Arbuckle*, 696 F. Supp. 2d at 924; *Tallman,* 167 F. App'x at 463; *Pleasant*, 895 F.2d at 276; *Leber*, 773 F.2d at 105. For example, an officer can display his weapon after engaging in a high-speed chase, *see e.g.*, *Tallman,* 167 F. App'x at 463; *Leber*, 773 F.2d at 105., and a reasonable officer could find that an extreme and reckless car accident like the one here warranted a similar response. Thus, the Court finds that the law is not clearly established and defendant is entitled to qualified immunity.

**V.     State Law Assault and False Imprisonment Claims**

        In *Rogers v. Gooding*, the Sixth Circuit held that qualified immunity for civil rights actions under § 1983 applies to state law torts claims as well. 84 F. App'x 473, 477 (6th Cir. 2003); *see also Cochran v. Town of Jonesborough*, No. 2:17-cv-44, 2018 WL 1144816, at *3, n.1 (E.D. Tenn. Mar. 2, 2018) ("[T]he same defense of qualified immunity that is available to police officers in causes of action under § 1983 is also available in causes of action under Tennessee state law."). Because defendant is entitled to qualified immunity for plaintiff's assault and false imprisonment claims, the Court need not reach the question of whether defendant is entitled to judgment as a matter of law on the § 1983 claim, the assault claim, or the false imprisonment claim.

**VI.    Conclusion**

        Accordingly, the Court **GRANTS** defendant's motion [Doc. 118], finding that defendant is entitled to qualified immunity on the § 1983 claim as well as the assault and false imprisonment claims. The Court also **GRANTS** plaintiff's motion to file a

supplemental brief [Doc. 121], having considered plaintiff's arguments in the foregoing

analysis.

IT IS SO ORDERED.

s/ Thomas A. Varlan_____
CHIEF UNITED STATES DISTRICT JUDGE